568 P.2d 1027

The STATE of Arizona, Appellee,

v.

Johnny E. McMAHON, Appellant.

No. 3627.

Supreme Court of Arizona,
In Banc.

March 4, 1977.

Bruce E. Babbitt, Atty. Gen. by William J. Schafer, III, and Diane M. DeBrosse, Asst. Attys. Gen., Phoenix, for appellee.

Ross P. Lee, Maricopa County Public Defender by Rudy J. Gerber, Deputy Public Defender, Phoenix, for appellant.

CAMERON, Chief Justice.

This is an appeal by the defendant, Johnny E. McMahon, from a verdict of guilty on a charge of armed robbery, A.R.S. §§ 13-641 and 643. Defendant was sentenced to the Arizona State Prison for a period of not less than five nor more than fifteen years.

The following questions are raised:

1. Was the entry and search of the defendant's apartment illegal?
2. Should the lineup identification of the defendant have been suppressed?
3. Was it error for Judge Riddel to rehear the defendant's motion to suppress?

The facts necessary for a determination of this matter on appeal are as follows. On 13 June 1975, the Safeway Market located at 2801 North Scottsdale Road was robbed by two white males. One of the suspects carried a .45 caliber blue steel automatic and the other carried a stainless steel revolver. The victims described the suspects noting that the larger of the two had a number of scars on his face. The suspects carried a blue gym bag during the robbery.

Sometime after the robbery of the Safeway store, Phoenix police detectives received certain information linking a suspect by the name of Michael McGuire with an armed robbery of a prostitute. Detectives Stovall and Patterson went to McGuire's Scottsdale apartment on 7 July 1975. While the record is somewhat unclear, Stovall and Patterson apparently intended to obtain a photograph of McGuire and possibly to arrest him. They did not have an arrest or search warrant.

Upon their arrival at the apartment complex, the detectives were informed by the manager that McGuire had a roommate known as "Johnny." They proceeded to the apartment, knocked once, waited a short time and knocked again. Detective Patterson testified as follows on direct examination:

"A * * * We could hear music inside. We knocked on the door and there was a pause. As I recall, we knocked again on the door identifying ourselves as police officers.

"As I recall now, that the music went off, somebody asked who it was. We identified ourselves again and I made the statement to 'Open the door or we would kick it down,' and after a few minutes the door was opened by a subject later identified to us as Johnny McMahon.

"Q Now, prior to the time you had threatened to kick the door down, had anyone responded to anything, your knocking, or anything you had stated?

"A As I recall, a voice on the other side had told us that Michael wasn't there. I don't recall anything else that they might have said.

"Q Now, was this prior to the time you threatened to kick the door in?

"A Yes, it was.

"Q Now, up until that time, had you seen anyone in the apartment, anyone open the door, or anything of this nature?

"A No, sir. No one had opened the door."

The defendant opened the door; was advised of his *Miranda* rights and was told that the detectives were investigating an armed robbery. The officers asked permission to enter and both testified that the defendant consented. According to the defendant's testimony, he responded to the request for permission to enter by asking if the officers had a search warrant. He testified further that Detective Stovall produced a search warrant which he assumed was valid. On this point Detective Stovall testified:

"Q Okay. Officer, at any time, did you tell the defendant that you had a search warrant, or indicate that you had something?

"A I may have said I had a search warrant, but it wasn't signed. And, if I told him that, I also told him that it wasn't signed. I may have, sir."

Shortly after entering the apartment, Detective Stovall noticed a partially burnt marijuana cigarette in an ash tray. When the defendant tried to grab the cigarette,

Detective Stovall placed him under arrest for possession of marijuana and handcuffed him. Following this arrest, Stovall noticed a small bag containing additional marijuana in plain view just outside an open arcadia door. The two detectives then searched the apartment. Stovall testified that this was a limited search for people only. However, his departmental report indicated that the search was for "contraband" as well. During the course of this search, Detective Stovall noticed a number of items including two 35 millimeter cameras, several toolboxes which he looked into, some briefcases, a hardhat, a jewelry display case, and some gym tote bags. None of these items were in any way linked to the Safeway robbery except possibly the gym tote bags. Detective Patterson testified that the defendant told him he could search the apartment except for McGuire's bedroom. The defendant denied having given any consent.

Sometime later that same day, Stovall and Patterson returned to the apartment complex. There they confronted and arrested Michael McGuire, the defendant's roommate and the suspect they were looking for in the robbery of the prostitute. This occurred on the balcony outside the apartment. A blue steel .45 caliber automatic and several small bottles of a substance called "creepy skin," a type of makeup, were found in McGuire's possession.

Detective Stovall testified that upon finding the "creepy skin" he recalled that there were other incidents in which the police were looking for a suspect who was believed to be using makeup of this type as a disguise. The following day Detective Stovall told Detective Hayden Williams about the arrests including the items seen in the apartment, the gun and the creepy skin. Detective Williams had been investigating a series of six factually related armed robberies. The Safeway robbery was among this group. Two male suspects had been involved in each. One of the suspects had severe scars on his face and some of the victims had indicated that these scars appeared to be fake. As a part of his investigation, Detective Williams had attempted to locate and purchase makeup capable of making such scars. He also had composite drawings of the two suspects.

As a result of the information received from Stovall, Detective Williams determined that McGuire fit the description of one of the suspects in this series of robberies and that the defendant fit the other. On 10 July he obtained a positive photographic identification of McGuire from the victim of one of the other robberies. The following day the defendant, McMahon, was placed in a lineup and identified by an employee of the Safeway store.

At the preliminary hearing on the charge of armed robbery, the Safeway employee, Larry Cochran, positively identified the defendant as one of the robbers.

On 17 October, a motion to suppress was argued before the Honorable Fred Hyder. Judge Hyder ruled that the entry into the defendant's apartment was illegal and evidence obtained as a result was to be excluded. He denied, however, the defendant's motion to suppress the identification.

On 24 November 1975, Judge Hyder disqualified himself and on 29 December the defendant filed a motion for reconsideration of his motion to suppress. The Honorable Marilyn A. Riddel, having found good cause (Rule 16.1(d), Rules of Criminal Procedure, 17 A.R.S.) to rehear defendant's motion, ruled on 12 January 1976 that neither the entry nor the search was illegal. On that basis defendant's motion to suppress was denied.

On 13 January, defendant agreed to submit the determination of his guilt or innocence to Judge Riddel, sitting without a jury, based on the transcripts of the preliminary hearing and the suppression hearings. Defendant was found guilty of armed robbery as charged and appeals from that judgment.

## LEGALITY OF THE ENTRY AND SEARCH

Defendant contends it was error for the court to fail to grant his motion to suppress. We agree.

■ It is undisputed that the officers did not have a valid arrest warrant when they went to the apartment. Under the facts presented, the initial entry can be justified, if at all, only upon the basis of consent. We have said that:

"In determining whether or not there was a consent, it is necessary that such a waiver or consent be proved by clear and positive evidence in unequivocal words or conduct expressing consent, and it must be established that there was no duress or coercion, actual or implied. (citations omitted)" *State v. Kananen,* 97 Ariz. 233, 235, 399 P.2d 426, 427 (1965).

Moreover, where the State seeks to establish that the defendant consented to a search, it must bear the burden of proof on that issue. *State v. Macumber,* 112 Ariz. 569, 544 P.2d 1084 (1976). In *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), the Supreme Court stated:

"that the question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." 412 U.S. at 227, 93 S.Ct. at 2048, 36 L.Ed.2d at 863.

■ In the instant case, no attempt was made by either detective to deny the fact that they threatened to kick the door down if it was not opened. The defendant testified that this threat induced him to open the door stating that he "didn't want to see it broken in." Clearly, his decision was not "voluntary."

Once the door was opened, the defendant was advised of his rights. That fact is, however, not determinative. *Schneckloth v. Bustamonte,* supra; *State v. Dean,* 112 Ariz. 437, 543 P.2d 425 (1975). While the defendant did agree to allow the officers to enter, he testified that he did so only after Detective Stovall showed him what appeared to be a valid search warrant. Defendant's testimony is buttressed by Detective Stovall's testimony that if he told defendant he had a warrant "I also told him it wasn't signed." The defendant's consent, if

in fact given, was vitiated by the admitted threat and by the subsequent assertion of lawful authority which the detectives did not have. *Bumper v. North Carolina,* 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). And the evidence of the resulting search should have been suppressed. *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). Our Court of Appeals has stated:

" * * * we are now committed to the law that evidence obtained in violation of these rights is not admissible in our Courts in prosecutions against individuals whose rights have been violated. (citations omitted)." *State v. Baca,* 1 Ariz. App. 16, 17, 398 P.2d 924, 925 (1965).

## SUPPRESSION OF THE IDENTIFICATION

Having concluded that the arrest of the defendant and the search of the apartment were illegal, we must now determine whether the defendant's motion to suppress the lineup identification should have been granted. It is conceded that if the identification is held to have been a "fruit" of the unlawful conduct of Detectives Patterson and Stovall, it must be excluded. *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

In this court's decision in *State v. Fortier,* 113 Ariz. 332, 553 P.2d 1206 (1976), we said:

"The 'fruit of the poisonous tree' doctrine, explained at length in *Wong Sun v. United States* (citation omitted), serves to exclude as evidence not only the direct products but also the indirect products of Fourth Amendment violations. Evidence is not classified as a fruit requiring exclusion, however, merely because it would not have been discovered 'but for' the primary invasion:

'Rather, the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint".' *Wong*

*Sun v. United States,* 371 U.S. at 488, 83 S.Ct. at 417, 9 L.Ed.2d at 455." 113 Ariz. at 335, 553 P.2d at 1209.

▮ The question which we must resolve is whether under the facts presented the identification of the defendant resulted from an exploitation of the unlawful police conduct. The ultimate burden of persuasion to establish that evidence obtained as the result of an illegal search is nonetheless untainted rests upon the State. However, the defendant must, as he did in the instant case, initially go forward with evidence demonstrating taint. *Alderman v. United States,* 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969); *State v. Fortier,* supra.

▮ In our opinion, the connection between the search and the subsequent lineup identification was "so attenuated as to dissipate the taint." *Nardone v. United States,* 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307, 312 (1939). The defendant was placed in the lineup not as a result of the illegal search of the apartment, but as a result of the arrest of the codefendant McGuire. As Detective Williams testified:

"Q Now, Mr. Williams, I am going to ask you a somewhat hypothetical question.

Assuming that you had not received the information regarding the items seen in the apartment by Detectives Patterson and Stovall, do you think you would have still conducted a lineup involving Mr. McMahon and Mr. McGuire?

"A Yes.

"Q Why would you have done so, without having knowledge of the items in the apartment?

"A Based on specifically the descriptions and the fact that we had composite drawings made up of the two suspects, which they fit, and mainly on the fact of the .45 that was found and creepy skin that was found at the time of McGuire's arrest."

In our opinion, the arrest of McGuire and the discovery of the makeup and the gun provided an independent source, free of the tainted search of the apartment, for the link between the defendant and the Safeway robbery. *State v. Ford,* 108 Ariz. 404, 499 P.2d 699 (1972), cert. denied 409 U.S. 1128, 93 S.Ct. 950, 35 L.Ed.2d 261 (1973), and was not an exploitation of the illegal search.

We find no error.

## REHEARING OF THE MOTION TO SUPPRESS

▮ The defendant was satisfied with the ruling of Judge Hyder on the motion to suppress as to the evidence found as a result of the illegal entry and was dissatisfied as to the ruling on the lineup identification which defendant contended was a direct result of the illegal search and seizure. The defendant moved Judge Riddel to rehear the matter. At that time Judge Riddel stated:

"I am sure you know that I am precluded by the rules, and I am most reluctant to intervene, if there has been a ruling made on a particular issue."

The defendant now contends that it was error for Judge Riddel to rehear his motion to suppress contending that the various divisions of the Superior Court do not have appellate jurisdiction with respect to each other. Ariz.Const., Art. 6, § 16; A.R.S. § 12–124.

Rule 16.1(d), Arizona Rules of Criminal Procedure (1973), states:

"d. *Finality of Pretrial Determinations.*

"Except for good cause, or as otherwise provided by these rules, an issue previously determined by the court shall not be reconsidered."

It was the defendant who sought to have the motion reheard. In support of his position, he submitted a memorandum arguing that there was good cause to do so. Defendant urged to the .court that there was good cause to reopen. Having convinced the court to do just that, the defendant cannot now be heard to complain because the court reopened and ruled against him. Thus, if there was any error it was invited by the defendant and we will not consider

the matter on appeal. *State v. Clark,* 112 Ariz. 493, 543 P.2d 1122 (1975); *State v. Wilcynski,* 111 Ariz. 533, 34 P.2d 738 (1975), cert. denied 423 U.S. 873, 96 S.Ct. 141, 46 L.Ed.2d 104 (1975). We find no error.

Judgment affirmed.

STRUCKMEYER, V. C. J., and HAYS, HOLOHAN and GORDON, JJ., concur.