THIRD DIVISION

FILED: 12/31/02

No. 1-02-0300

THE PEOPLE OF THE STATE OF ILLINOIS, ) Appeal from the

) Circuit Court of

Plaintiff-Appellee, ) Cook County.

)

v. ) 

)

MICHAEL FLOURNOY, ) Honorable

) Daniel P. Darcy,

Defendant-Appellant. ) Judge Presiding.

JUSTICE HOFFMAN delivered the opinion of the court:

Following a jury trial, the defendant, Michael Flournoy, was found guilty of attempted first degree murder, armed robbery, and aggravated battery with a firearm.  He was sentenced to a twenty-four year prison term for each offense, the sentences to be served concurrently.  On appeal, the defendant contends that he was denied a fair trial because: 1) improper and highly prejudicial hearsay testimony that a non-testifying witness identified him from a photographic array and a lineup was admitted at trial; and 2) a comment made by a witness during his testimony suggested to the jury that the defendant had another witness killed prior to trial.  The defendant further maintains that his trial counsel provided ineffective assistance in that he failed to preserve either of these issues for review.  Finally, he contends that the trial court abused its discretion in sentencing him to 24 years in prison.  For the following reasons, we reverse and remand for a new trial.

The State presented the following evidence at trial.  Ronald Hill testified that, at 11:45 p.m. on February 23, 2000, his friend, John Theus, was giving him a ride home.  Theus stopped at a gas station located at 78
th
 Street and King Drive.  Before pumping gasoline into Theus's vehicle, Hill went inside the station and pre-paid for the gasoline.  A second car was parked about eight feet away from Theus's car.  According to Hill, Theus was "in the doorway" of his car, with one leg outside the car, speaking to a friend of his who was sitting in the second car.  Hill testified that, as he was pumping the gasoline, a white sports utility vehicle (SUV) pulled into the station and parked in such a manner as to "cut off" the cars of Theus and his friend.  A man whom Hill identified in court as the defendant exited the driver's side of the vehicle brandishing a gun and said to Theus, "what's up bitch, you got something for me."  The defendant then walked over to the second car and shook hands with the driver.  Next, the defendant walked over to Theus and, in Hill's words, "started to question him, asking him about I hear you've been around here asking questions about me, you're trying to get in touch with me, you got something for me".  According to Hill, a second person, a light-skinned man with braids, then exited the SUV and "ran over" to where the defendant was standing.

Hill testified that he was afraid and was going to run, but a third person, a "stocky, brown-skinned" man, exited the SUV, approached him, and stated that he would "pop" Hill if he ran.  Hill understood this to mean that he would be shot.  This man put Hill on the trunk of the car, searched his pockets and took about $350, and told Hill that if he "wanted to live long, [he] shouldn't hang around certain people."  At that point, Hill looked up and saw the defendant and the man with braids hitting Theus in the face with guns.  The defendant was hitting Theus on the top of the head with the barrel of a .45-caliber gun, and the other man was hitting Theus in the face with the handle of a gun.  The two men hit Theus "numerous" times.  

Hill testified that, after taking his money, the stocky man told him to get into the back seat of the car, which Hill did.  This man then held a 9-millimeter Glock to Theus's thigh and fired.  Theus jumped up and grabbed the barrel of the gun, at which point the defendant asked Theus if he wanted "some more" and stated: "You don't want to do that."  Theus released the barrel of the gun.  According to Hill, the beating that Theus received lasted 15 to 20 minutes.

Hill testified that, after the gunshot, the second car, with whose occupants Theus had been conversing, drove away.  The defendant walked up to Theus and kissed him on the mouth.  Theus then got into his car, pulled forward a bit, placed the car into reverse gear, and backed up into the man who shot him, which was the same man that robbed Hill.  At that point, Hill testified, "[e]verybody started shooting."  Hill ducked down onto the floor in the back seat of the car and heard more than 10 shots.  Theus drove out of the gas station and, eventually, went to Jackson Park Hospital.  At the hospital, Hill noticed that Theus was bleeding from the top of his head and his lips were swollen.  Hill testified that, at the hospital, he gave the police a physical description of the defendant as being 20 to 25 years old, standing 5' 10'' tall, weighing 180 pounds and wearing his hair in twists or cornrows.  Hill testified that Theus died two weeks prior to trial.

Hill testified that, on March 5, 2000, Chicago police detective Fidyk showed him some photographs from which he identified the defendant.  The prosecutor asked Hill if anyone was with him at the time he viewed the photographs.  Hill testified that Theus was with him and had also viewed the photographs.  The prosecutor then asked Hill if Theus had identified anyone from the photographs.  Defense counsel objected, and the trial court overruled the objection. Hill testified that Theus identified the defendant.  Hill also testified that, on September 12, 2000, he went to the police station and viewed a lineup from which he identified the defendant as the man who drove the SUV and who "initiat[ed] everything."  Hill testified that he had never seen the defendant before this incident occurred on February 23, 2000.

Hill acknowledged that he had been convicted of burglary, unlawful use of a weapon, possession of a controlled substance, possession of a stolen motor vehicle, and forgery.

On cross-examination, Hill testified that, on February 24, 2000, the day after the incident in question, he saw the defendant in a vehicle stopped at a stoplight at 79
th
 Street and Cottage Grove.  He did not, however, tell the police about this until September 2000.  Defense counsel asked Hill whether he received an early release from prison in exchange for his trial testimony.  Hill denied this. On re-direct examination, the prosecutor asked Hill whether he had been promised anything in exchange for his testimony.  Hill testified that he had not.  The following exchange then took place:

"Q.  Why are you testifying here?

A.  Because my friend is now deceased, I'm scared for my family and I just –

MR. ABRAMS [DEFENSE COUNSEL]: Objection.

COURT: Objection sustained.  Answer will be stricken.  Jury ordered to disregard it."

The prosecutor completed his re-direct examination, and the trial judge then had a discussion off the record with both attorneys.  After that discussion, the judge dismissed Hill from the stand and admonished the jury that Theus's death several weeks prior to trial had nothing to do with the injuries he received on February 23, 2000.  The trial judge stated that he was giving the admonishment by agreement of the parties and each of the attorneys stipulated to the content of the admonishment.

Chicago police officer Tibbs testified that, around 1 a.m. on February 24, 2000, he and his partner, Officer Jones, received a call that a person had been shot.  They went to Jackson Park Hospital, where Officer Tibbs saw that Theus had bruises to his face and a gunshot wound to his leg.   Chicago police officer Marcus Broadway testified that, around 1 a.m. on February 24, 2000, he and his partner, Officer Mark Brown, received an assignment to go to a gas station located at 7858 South King Drive and search for evidence of a crime.  When the officers arrived, the station attendant gave them two spent .45 caliber shell casings and one spent 9-millimeter shell casing which he had found on the premises.

Chicago police detective David Fidyk testified that, on February 28, 2000, he and his partner went to the gas station to examine the scene of the crime.  Upon noticing some holes in one of the gas pumps, the detectives asked an employee to remove the cover from two back-to-back gas pumps.  When the cover was removed, the detectives saw what appeared to be two bullets and called for an evidence technician.  Chicago police officer Charles Woodhouse, the evidence technician who reported to the scene, testified that he recovered two fired bullets from inside the pumps.

Detective Fidyk further testified that, on March 5, 2000, he interviewed Theus and showed him a photographic array.  According to Detective Fidyk, Theus identified the defendant as being involved in the incident.  The detective acknowledged that he had authored two conflicting reports, one stating that Theus said the defendant was the person who shot him and the other stating that the defendant was involved in the incident but was not the person who shot him.  Detective Fidyk testified that he also interviewed Hill on March 5, 2000, and showed him a photographic array, from which Hill identified the defendant.

Chicago police detective Michael Cummings testified that, on September 12, 2000, Theus viewed a lineup and identified the defendant.  Later that same day, Hill viewed a lineup and identified the defendant as one of the men who robbed him and Theus and stated that the defendant had been armed with a handgun.

The State rested.  The defendant presented three alibi witnesses.  Judy Butler, the defendant's sister, and Aisha Flournoy, the defendant's wife, both testified that, on February 23, 2000, the defendant and his wife lived with Butler.  Flournoy testified that the gas station where the incident occurred is located "maybe six blocks" from Butler's apartment.   Both women testified that the defendant left home around 7:30 p.m. on the evening of February 23 but that he returned home at about 8:30 p.m. and did not go out again.  Butler went to bed after midnight, and the next time she saw the defendant was at 8:30 the following morning.  Flournoy testified that she went to bed around 11:45 p.m., and the defendant came to bed around midnight.  Both Butler and Flournoy testified that the defendant has never worn his hair in braids or cornrows.  The defendant's uncle, Hammette Jones, testified that he arrived at Butler's home around 9 p.m. on the night in question and stayed until around 12:30 a.m.  The defendant was home the entire time Jones was there. Jones testified that he has never seen the defendant with his hair in braids or cornrows.  Jones also testified that Butler's home was located approximately three blocks away from 79
th
 Street and King Drive.

The defendant testified on his own behalf.  He acknowledged that he had been convicted of aggravated battery and possession of a firearm.  The defendant testified that he went to grammar school with Theus, but that he had never seen Hill prior to Hill's courtroom testimony.  According to the defendant, on February 23, 2000, he and his wife were living with his sister, Butler in an apartment which was located three blocks from the gas station where the incident in question occurred.  He arrived home around 5 p.m. that day.  According to the defendant, prior to 7:40 p.m., his friend, Will Lewis, picked him up in a white SUV truck.  The two went to an after hours club where they intended to watch an award show on television.  The defendant was not admitted to the club as he did not have any identification with him.  He and Lewis then went to the barbershop where Lewis worked.  After Lewis checked his messages, he took the defendant home.  The defendant testified that he arrived home at "[p]robably 8:05, 8:10."  When he arrived home, his mother, his sister, and his wife were there.  Jones arrived later.  According to the defendant, after arriving home, he did not go out again.

The defendant also testified that, between February 24, 2000, and September 11, 2000, he saw and/or conversed with Theus approximately twice per week.  During that time, the defendant never exchanged any harsh words with Theus.

The defendant testified that he is 5' 7" tall and weighs 150 pounds.  When shown a photograph of the lineup in which he appeared, he testified that the ruler which appeared next to his head showed that he was 5' 6" or 5' 7" tall.

The jury found the defendant guilty of attempted first degree murder, armed robbery, and aggravated battery with a firearm.  After denying the defendant's post-trial motions, the trial court sentenced the defendant to three concurrent prison terms of 24 years.  The defendant now appeals.

On appeal, the defendant first contends that he was denied a fair trial in that both Hill and Detective Fidyk were allowed to testify that Theus viewed a photographic array from which Theus identified the defendant and that Detective Cummings was allowed to testify that Theus identified the defendant in a lineup.  He contends that this evidence was hearsay and highly prejudicial, requiring reversal.  The defendant acknowledges that, while his attorney objected to Hill's testimony, no objection was raised to the testimony of Detectives Fidyk or Cummings and the issue was not raised by way of post-trial motion.  He maintains, however, that we should review the issue as a matter of plain error.  He also contends that his trial counsel provided ineffective assistance by failing to make appropriate objections at trial and failing to raise the issue in a post-trial motion.  

Testimony regarding an out-of-court statement which is offered to prove the truth of the matter asserted constitutes hearsay evidence.  
People v. Carpenter
, 28 Ill. 2d 116, 121, 190 N.E.2d 738 (1963).  Because the reliability of such testimony rests upon the credibility of an out-of-court asserter, it is barred unless it falls within a recognized exception to the hearsay rule.  
Carpenter
, 28 Ill. 2d at 121; 
People v. Olinger
, 176 Ill. 2d 326, 357, 680 N.E.2d 321 (1997).  Here the State presented the testimony of Hill and Detective Fidyk that Theus identified the defendant from a photographic array and Detective Cummings's testimony that Theus identified the defendant in a lineup.  The testimony was clearly offered to prove the truth of the matter asserted, namely that the defendant was one of the offenders involved in the incident which occurred on February 23, 2000.  The State does not assert otherwise.  Nor does the State assert that the testimony in question falls within an exception to the hearsay rule.  Rather, the State concedes that the admission of the testimony was error but argues both that the defendant has waived the issue and that the error was harmless in light of Hill's positive identification of the defendant.

We agree with the defendant that the testimony in question constitutes hearsay and that its admission was error.  See 
People v. Armstead
, 322 Ill. App. 3d 1, 12-13, 748 N.E.2d 691 (2001); 
People v. Lopez
, 152 Ill. App. 3d 667, 672-74, 504 N.E.2d 862 (1987).  We must, therefore, determine whether to address the issue despite the defendant's failure to properly preserve it for review.  See 
People v. Mullen
, 141 Ill. 2d 394, 401, 566 N.E.2d 222 (1990)(in order to properly preserve  issue for review, defendant must object to the error both at trial and in post-trial motion).

 The plain error rule is a narrow exception to the rule of waiver and is invoked only where the evidence is closely balanced or the alleged error is so substantial as to deprive the defendant of a fair trial.  
People v. Kunto
, 196 Ill. 2d 105, 128, 752 N.E.2d 380 (2001); 134 Ill. 2d R. 615(a).  Only one witness at trial identified the defendant as having been involved in the offenses which occurred on February 23, 2000, and there is no physical evidence implicating him.  Further, the defendant testified that he was at home at the time the offenses were committed and presented the testimony of three alibi witnesses to the same effect. Thus, as we will explain more fully below in addressing the State's contention that the error was harmless, we believe the evidence was closely balanced.   See 
Armstead
, 322 Ill. App. 3d 1.  Where the evidence in a case is closely balanced, we apply the plain error rule to consider otherwise waived contentions of error so as "to preclude the possibility that an innocent man was wrongly convicted as a result of even a minor error."  
People v. Berry
, 244 Ill. App. 3d 14, 24, 613 N.E.2d 1126 (1991).  Accordingly, we will consider the merits of the defendant's argument that he was denied a fair trial due to the erroneous admission of the hearsay identification testimony.

As discussed above, the State concedes that the admission of the testimony in question constituted error but maintains that the error was harmless.  In order for trial error to be considered harmless, there must be no reasonable probability that the outcome of the trial would have differed if the excluded testimony had been admitted.  
People v. Hood
, 244 Ill. App. 3d 728, 734, 614 N.E.2d 335 (1993).  In support of its contention that the error involved here is harmless, the State cites to 
People v. Colon
, 162 Ill. 2d 23, 34, 642 N.E.2d 118 (1994).  In 
Colon
, the defendant argued that he had been denied a fair trial by the introduction of a detective's hearsay testimony which clearly implied that two non-testifying eyewitnesses to the crime at issue had identified him in a lineup.  
Colon
, 162 Ill. 2d at 33-34.  Our supreme court concluded that, although the testimony in question may have constituted hearsay, its admission was harmless error.  The court stated that:

"hearsay identification is reversible error only when it serves as a substitute for courtroom identification or when it is used to strengthen or corroborate a weak identification.  If, however, the testimony is merely cumulative or is supported by a positive identification and by other corroborating circumstances, it constitutes harmless error."  
Colon
, 162 Ill. 2d at 34.

In determining that the admission of the hearsay identification testimony at issue constituted harmless error, the court in 
Colon
 stated that "the defendant was positively identified by two other witnesses in addition to a substantial amount of corroborative evidence."  
Colon
, 162 Ill. 2d at 34-35.  Although the court did not specify the corroborative evidence to which it referred, the opinion reveals that, two days after the offense, the defendant was driving a vehicle which matched the description the two testifying witnesses gave of the vehicle used in the offense and those witnesses later identified the defendant's vehicle.  
Colon
, 162 Ill. 2d at 28-29.

The State asserts that the evidence in the instant case was even stronger than that in 
Colon
.  It argues that Hill's identification of the defendant is corroborated by evidence that the defendant was in a white SUV truck, the type of vehicle used in the offense, on the night in question, that he lived three blocks from the gas station where the offense occurred, and that he matched the general description of the offender that Hill gave to the police on the night of the offense.  We fail to see how the fact that the defendant lived just three blocks from the scene of the offense in any way suggests that he was involved in the offense.  Further, while the defendant testified that he was in a white SUV truck on the night of the offense, he testified that he returned home shortly after 8 p.m. and did not leave home again that night.  The offense in question took place at 11:45 p.m.  In addition, there was no evidence that the white SUV that the defendant was in that evening was the same vehicle used by the offenders.  Finally, the State asserts that the defendant matches the general description which Hill gave to the police on the night of the offense.  Hill testified that he described the defendant as 5'10" tall and weighing 180 pounds.  The defendant, however, testified that he is 5' 7" tall and weighs 150 pounds.  Further, when shown a photograph of the lineup in which he appeared, the defendant testified that a ruler which appeared next to his head in the photograph showed that he was 5' 6" or 5' 7" tall.  The photographs are not in the record before us.  We cannot say that the evidence introduced at trial supports the State's assertion that the physical description which Hill gave to the police on the night of the offense corroborates his in-court identification of the defendant.  We agree with the defendant that the instant case is distinguishable from 
Colon
 in that here there was only one eyewitness identification of the defendant, as opposed to the two in 
Colon
, and, contrary to the State's assertion, there was no corroborating evidence. 

We are left with the question of whether the erroneous admission of hearsay testimony that a non-testifying witness identified the defendant constitutes harmless error when only one witness identified the defendant at trial and there is no corroborating evidence of guilt.  There is conflicting authority on this issue.

In 
People v. Miles
, 176 Ill. App. 3d 758, 531 N.E.2d 891 (1988), the defendant argued that plain error occurred in that the State introduced hearsay testimony that an anonymous caller telephoned the police and stated that the defendant had committed the murder in question.  One witness at trial had identified the defendant.  The 
Miles
 court, citing that witness's positive identification and the corroboration of that witness's testimony, concluded that the error was harmless as the evidence of the defendant's guilt was overwhelming.  
Miles
, 176 Ill. App. 3d at 764-65.  The corroborative evidence to which the court referred confirmed details of the witness's account as to how the offense occurred but it does not appear there was any independent evidence linking the defendant to the commission of the offense.  The 
Miles
 court stated, however, that the single positive witness identification constituted overwhelming evidence of the defendant's guilt.  
Miles
, 176 Ill. App. 3d at 765.

In 
People v. Sweeny
, 57 Ill. App. 3d 879, 373 N.E.2d 663 (1978), a husband and wife had been robbed at gunpoint by two men.  At trial, the wife identified the defendant.  On appeal, the defendant complained  of the erroneous admission of evidence that both the wife and the husband, who did not testify at trial, had identified the defendant in a photographic array and a lineup.  The 
Sweeny
 court noted that the defendant had not raised the issue in his post-trial motion and  concluded that, in light of the positive identification of the wife, no plain error had occurred.  
Sweeney
, 57 Ill. App. 3d at 883.

A contrary result was reached in 
People v. Armstead
, 322 Ill. App. 3d 1, 748 N.E.2d 691 (2001), and 
People v. Johnson
, 68 Ill. App. 3d 836, 386 N.E.2d 642 (1979).  In 
Armstead
, the victim acknowledged that, shortly after the offense, he had identified the defendant as the person who shot him but testified that he did not actually see the shooter's face.  One witness did identify the defendant as the shooter.  There was no other evidence implicating the defendant.  The defendant testified that he was elsewhere at the time of the offense and presented a witness to confirm his alibi.  
Armstead
, 322 Ill. App. 3d at 4-9.  On appeal, the defendant argued that a police officer's hearsay testimony which clearly implied that a non-testifying witness had identified him as the shooter constituted reversible error.  Addressing the issue pursuant to the plain error rule, the 
Armstead
 court reversed the defendant's conviction and remanded for a new trial, finding that the evidence in the case was close and that the testimony in question "could have affected the outcome of the case."  
Armstead
, 322 Ill. App. 3d at 12-13.

In 
Johnson
, one witness identified the defendant at trial as the person who robbed the store where she worked.  The defendant testified and denied having been in the store on the date in question and presented an alibi witness.  
Johnson
, 68 Ill. App. 3d at 838-39.  On appeal, the defendant argued that the admission of testimony, by two witnesses, that another store employee, who did not testify, had also identified the defendant constituted inadmissible and prejudicial hearsay. The court concluded that the admission of the evidence constituted error and rejected the State's argument that the error was harmless.  
Johnson
, 68 Ill. App. 3d at 842-43.  The 
Johnson
 court noted that the out-of-court identification was referred to by two testifying witnesses and re-emphasized during closing arguments.  It stated that, while the single positive eyewitness identification at trial "alone may have been enough to convince the jury of the defendant's guilt, we cannot ignore the repeated references to *** [the hearsay] identification and the effect this may have had on the jury."  
Johnson
, 63 Ill. App. 3d at 843.

We find the reasoning in 
Armstead
 and 
Johnson
 to be more sound than that in 
Miles
 and 
Sweeney
.  Hill was the only witness who identified the defendant at trial, and there was no other evidence linking him to the offenses.  The defendant testified that he was at home at the time of the offense and presented three witnesses who confirmed this alibi.  The jury heard, not once but three times, that Theus had identified the defendant as one of the offenders involved in the incident on February 23, 2000.  This clearly lent support to Hill's identification.  Although Hill's identification was sufficient to support a finding of guilt (
People v. Negron
 297 Ill. App. 3d 519, 529, 697 N.E.2d 329 (1998) (identification of single eyewitness will sustain conviction if witness viewed accused under circumstances allowing positive identification)), we cannot say that the multiple references to Theus's identification of the defendant had no effect on the outcome of the case.  Accordingly, we reverse the defendant's convictions and sentences and remand for a new trial.  In doing so, we find the evidence was sufficient to support defendant's convictions, so that double jeopardy considerations do not prevent retrial.  
People v. Olivera
, 164 Ill. 2d 382, 393, 647 N.E.2d 926 (1995).

Due to our disposition of this appeal, we find it unnecessary to address the defendant's contentions that he was denied a fair trial because Hill made a statement which suggested to the jury that the defendant had Theus killed prior to trial, that he received ineffective assistance of counsel, and that his sentence is excessive.

For the foregoing reasons, we reverse the defendant's convictions and sentences remand for a new trial.

Reversed and remanded.

SOUTH, P.J., and WOLFSON, J., concur.